# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ERLENE J. ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-04-S-222-NE** |
| | ) | |
| **CINGULAR WIRELESS** | ) | |
| **EMPLOYEE SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | | |

## MEMORANDUM OPINION

Plaintiff, Erlene Adams, an African American female, alleges race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq*., when defendant, Cingular Wireless Employee Services, Inc., terminated her employment.  This action is before the court upon defendant's motion for summary judgment.[1]  Plaintiff filed a response that was not in compliance with the court's Initial Order, citing to defendant's previously submitted evidentiary submission.[2]

---

[1] *See* doc. no. 22.

[2] *See* doc. no. 24 (Plaintiff's Response) and doc. no. 12 (Initial Order Governing All Further Proceedings). Appendix II to the Initial Order requires the party opposing summary judgment to respond to the moving party's statement of undisputed facts, indicating whether they are admitted or disputed.  Appendix II further states "*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"  *Id*. Appendix II at iii-iv.  As plaintiff failed to respond or object to defendant's statement of undisputed facts as outlined by the court, defendant's facts will be deemed admitted hereinafter.  Further, and in violation of the court's Initial Order, plaintiff failed to set out in separately numbered sentences her statement of facts and failed to insert an evidentiary citation after each sentence in her statement of facts.  Finally, it appears

Defendant filed a reply brief.[3]

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

---

plaintiff failed to cause a copy of her response to be served on defendant's counsel without undue delay. *See* doc. no. 28 at 2 n.1 (Defendant's Reply Brief).

[3]*See* doc. no. 28.

2

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  The

motion pierces the pleadings, and "strikes at the heart of the claim.  In effect it argues

that as a matter of law upon admitted or established facts the moving party is entitled

to prevail."  Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed.

1994).

## II.  FACTUAL BACKGROUND

### A.    Parties and Witnesses

Cingular is a wireless communications service provider. (Exhibit 1, ¶ 2).

Cingular was created in 2000 as a joint venture between BellSouth Mobility and SBC

Communications. (Exhibit 1, ¶ 2).  Kyle Rakestraw (Caucasian) is employed by

Cingular in Birmingham, Alabama, as a Senior Information Technology ("IT")

Manager. (Exhibit 1, ¶ 3).  Mr. Rakestraw manages the IT department, which is

responsible for IT functions throughout the State of Alabama. (Exhibit 1, ¶ 3).

The IT department's "clients" are other Cingular employees working in retail

stores, human resources, the engineering group, and the marketing group. (Exhibit 1,

¶ 3; Exhibit 3, pp. 30-31).  When a "client" has a problem with a computer, the IT

department solves the problem and also handles many other projects, such as setting

up computer systems in new retail stores. (Exhibit 1, ¶ 3; Exhibit 3, pp. 30-32).

Susan Horcharik (Caucasian) is a Senior Human Resources Manager for Cingular. (Exhibit 2, ¶ 2 ).  Ms. Horcharik handles human resources issues for Cingular's IT employees in Alabama. (Exhibit 2, ¶ 3).

Plaintiff, Erlene Adams (African American), began her employment with BellSouth Mobility in 1994, and she began working for Cingular when it was formed in 2000. (Exhibit 3, pp. 25-27).  Ms. Adams was employed in the IT department as an IT Analyst until Mr. Rakestraw terminated her employment on September 2, 2003. (Exhibit 1, ¶¶ 14 and 29).  During her employment, Ms. Adams performed several functions, including assisting clients who contacted the IT department with problems, such as:  "I am unable to remote into the server"; or "Computer won't boot"; or "Mouse don't (sic) work" or "Keyboard don't (sic) work." (Exhibit 3, p. 32).  Ms. Adams described her supervisor, Mr. Rakestraw, as "just kind of laid back and let us do our jobs." (Exhibit 3, pp. 35-36).

## B.    Ms. Adams Was Provided a Cingular Visa Card During Her Employment With Cingular

Ms. Adams applied for a Cingular JP Morgan Commercial Visa Card ("Cingular Visa Card") during March or April of 2002. (Exhibit 3, pp. 44-45; Exhibit 2, ¶ 5, Appendix B).  The Cingular Visa Card was provided to employees who

4

traveled or routinely made purchases for business purposes. (Exhibit 1, ¶ 5, Appendix B, p. 1[4] ("**Why do I want a Cingular Commercial Card?**  If you travel or routinely make purchases for business purposes you are required to use the Cingular card."(emphasis in original)).  Ms. Adams received a Cingular Visa Card and incurred her first charge on April 18, 2002. (Exhibit 1, ¶ 5, Appendix H (list of all charges that Ms. Adams incurred on her Cingular Visa card)).

**C.     Ms. Adams Knew That She Was Not Permitted to Incur Personal Charges on Her Cingular Visa Card**

       **1.     Cingular's Code of Business Conduct**

Cingular issued a Code of Business Conduct in 2000. (Exhibit 1, ¶ 4).  Ms. Adams reviewed the Code of Business Conduct, but she does not remember when she did so. (Exhibit 3, pp. 37-39).  The Code of Business Conduct provides: "Company provided credit cards may not be used for personal expenses." (Exhibit 1, ¶ 4, Appendix A).  Since at least January 2001, the Code of Business Conduct has been available on Cingular's intranet at "http://my-cingular." (Exhibit 1, ¶ 4).  Ms. Adams was aware that Cingular's policies and procedures were located on Cingular's intranet at "http://my-cingular." (Exhibit 3, p. 41; Exhibit 1, ¶ 4).

---

[4]A citation such as this directs the reader to Appendix B of Exhibit 1.  Exhibit 1 is Mr. Rakestraw's affidavit, and it contains several appendices.

## 2.    March 15, 2002 Email to All Employees

In 2000, Cingular employees were still using the corporate American Express charge cards ("American Express cards") that had been provided to them by Cingular's predecessor, BellSouth Mobility. (Exhibit 1, ¶ 5).  On March 15, 2002, Cingular sent all of its employees an electronic communication ("email") instructing them to destroy their American Express cards and apply for a new Cingular JP Morgan Commercial Visa card ("Cingular Visa Card"). (Exhibit 1, ¶ 5, Appendix B). Under the heading "Frequently Asked Questions about the Cingular Card," the March 15, 2002 email provides: "**Can I use the card for personal charges as well?**  No. Use of the card for personal charges is prohibited." (emphasis in original). (Exhibit 1, ¶ 5, Appendix B, p. 2).  Ms. Adams believes she probably received the March 15, 2002 email but never read it. (Exhibit 3 pp. 50-51).

## 3.    Ms. Adams' Application for Her Cingular Visa Card

The application that Ms. Adams completed to obtain her Cingular Visa Card provides: "Applicant . . . agrees that the Commercial Card will be used for business or commercial purposes only . . . ." (Exhibit 2, ¶ 5, Appendix B).  Ms. Adams personally completed the application and submitted it. (Exhibit 3, pp. 44-47).

## 4.    June 18, 2002 Email to All IT Employees

On June 18, 2002, Cingular's Chief IT Officer, Thaddeus Arroyo, sent an email

6

to all Cingular IT employees, which included Ms. Adams. (Exhibit 1, ¶ 6, Appendix C).    The June 18, 2002 email provides: "Over the last few months we have communicated significant changes concerning Cingular expense guidelines and the issuance of new Cingular Commercial Visa Credit Cards.  As a follow-up, I would like to remind you of the importance of complete adherence to Cingular's expense reimbursement policies and guidelines."(Exhibit 1, ¶ 6, Appendix C, p.1).  The June 18, 2002 email provides: "Misuse or fraudulent use of the Company credit card is in direct violation of the Code of Business Conduct and could result in disciplinary actions or constitute grounds for dismissal." (Exhibit 1, ¶ 6, Appendix C, p. 2).

The 2001 expense guidelines, which are referenced in the June 18, 2002 email, contain a page entitled "ANSWERS TO COMMONLY ASKED QUESTIONS." (Exhibit 1, ¶ 7, Appendix D). That page provides: "Q:  Can I use the Company Issued Credit Card for personal use? *A: No.  The Company Card is to be used for business expenditures only.  Misuse or fraudulent use of the Card is in direct violation of the Code of Business Conduct and could result in disciplinary actions or grounds for dismissal.*" (emphasis in original) (Exhibit 1, ¶ 7, Appendix D).  Ms. Adams believes she probably received the June 18, 2002 email but never read it. (Exhibit 3, pp. 50-51).

**D.   Ms. Adams Incurred Many Charges for Personal Expenses on Her Cingular Visa Card in 2002**

During Ms. Adams' deposition, she was shown a document that listed all of the charges she had incurred on her Cingular Visa Card in 2002. (Exhibit 3, p. 60). During Ms. Adams' deposition, she was asked to put a check mark next to each charge on the document that was a personal expense. (Exhibit 3, p. 62.).  A true and correct copy of the document, including all of Ms. Adams' check marks, is contained in Defendant's Evidentiary Submission at Exhibit 6.

Ms. Adams admits that she incurred ten (10) charges for personal expenses on her Cingular Visa Card from April 2002 to December 2002. (Exhibit 6; Exhibit 3, pp. 63-67).  The ten (10) charges totaled more than four hundred and fifty dollars ($450.00). (Exhibit 6; Exhibit 3, pp. 63-67).  The ten (10) charges were for meals, groceries, repairing a tire on Ms. Adams' car, and having the oil changed in her car. (Exhibit 3, pp. 63-67; Exhibit 6).  There are additional charges that Ms. Adams incurred at Wal-Mart and Pizza Hut on her Cingular Visa Card, and she does not know whether these charges were for business purposes.  (Exhibit 3, pp. 72-73,76-77).  Ms. Adams had her own personal credit cards in 2002, but she chose not to use them for these expenses. (Exhibit 3, pp. 83-84).

**E.    Cingular Changed Employee Reimbursement Systems on December 16,
2002**

Prior to December 16, 2002, Cingular employees were reimbursed through a
system called  "Gelco." (Exhibit 1, ¶ 8).[5]  Under the Gelco system, an employee's
monthly credit or charge card bill was not sent to Cingular. (Exhibit 1, ¶ 8; Exhibit
3, p. 53).  Consequently, Cingular was not aware of any expenses an employee would
have incurred on their charge card and paid without seeking reimbursement from the
company. (Exhibit 1, ¶ 8).

Effective December 16, 2002, Cingular implemented a new reimbursement
system called "Concur Expense." (Exhibit 1, ¶ 9).  Concur worked as follows: (1)
every time an employee incurred a charge on a Cingular Visa Card, it was
automatically electronically posted by Visa on the employee's Concur account; (2)
the employee would log onto the Concur system and note the reason for each expense
(airfare, car rental, hotel conference, business supplies, meals etc.) on an electronic
expense report; (3) if an employee attempted to note an expense as personal, a box
would immediately pop-up on the computer screen and notify the employee that
personal expenses are a violation of company policy; (4) after noting all expenses, an
employee would click on "submit"; (5) an employee would then send all back-up

---

[5]As fully discussed below, the change in reimbursement systems led to Cingular discover that
many employees were using their Cingular Visa Cards to incur charges for personal expense.

9

receipts by facsimile to Concur. (Exhibit 1, ¶ 10).  If an employee noted the reason for an expense as personal or simply failed to note the reason for an expense, Concur automatically sent an email to the employee and the employee's manager notifying them of these events. (Exhibit 1, ¶ 10).

**F.    Rodney Milton Was the First Employee in the IT Department That Was Caught Incurring Personal Charges on a Cingular Visa Card**

On January 18, 2003, which was only one month after Cingular started using Concur, Concur sent Mr. Rakestraw an email regarding one of his employees, Rodney Milton.  (Exhibit 1, ¶ 11, Appendix F (copy of the email)).  The email states, in part: "Your employee was notified that failure to document these expenses can be a violation of Cingular's Code of Business Conduct." (Exhibit 1, Appendix F).  Shortly thereafter, Mr. Milton told Mr. Rakestraw words to the effect that he would take care of the matter. (Exhibit 1, ¶ 11).  On Thursday, January 30, 2003, however, Mr. Rakestraw received a similar email from Concur about Mr. Milton. (Exhibit 1, ¶ 12, Appendix G (copy of the email)).  The email states, in part: "Your employee was notified that failure to document these expenses can be a violation of Cingular's Code of Business Conduct." (Exhibit 1, Appendix G).

Mr. Rakestraw called Mr. Milton on January 30, 2003 and asked him what happened. (Exhibit 1, ¶ 12).  Mr. Milton said, "I've been dreading this call," and  "I

fell behind on my expenses ever since that class that I took and I had to use my card for personal expenses." (Exhibit 1, ¶ 12).  Mr. Rakestraw asked Mr. Milton if he incurred personal charges on his Cingular Visa Card.  Mr. Milton said, "yes." (Exhibit 1, ¶ 12).  Mr. Rakestraw did not know that Mr. Milton had been incurring personal charges on his Cingular Visa Card. (Exhibit 1, ¶ 12).

Mr. Rakestraw asked Mr. Milton whether his supervisor, Erlene Adams, or any supervisor at Cingular had told him that it was acceptable to incur personal charges on his Cingular Visa Card.  Mr. Milton said, "no." (Exhibit 1, ¶ 12).  Mr. Milton told Mr. Rakestraw that he knew it was "wrong" to incur personal charges on his Cingular Visa Card. (Exhibit 1, ¶ 12).  Mr. Rakestraw ended the conversation by telling Mr. Milton that this was a serious matter, and that Mr. Rakestraw would need to contact the human resources department. (Exhibit 1, ¶ 12).

**G.    Mr. Rakestraw Investigated His Other Employees to Determine Whether They Were Also Incurring Personal Charges on Their Cingular Visa Cards**

After speaking with Mr. Milton on January 30, 2003, Mr. Rakestraw immediately called Susan Horcharik. (Exhibit 1, ¶ 13).  Mr. Rakestraw and Ms. Horcharik agreed that Mr. Milton's personal charges appeared to be a clear violation of Cingular's policy and a terminable offense. (Exhibit 1, ¶ 13).  To be consistent, however, Ms. Horcharik said she would check internally to determine how similar

situations had been handled by Cingular. (Exhibit 1, ¶ 13).  Ms. Horcharik and Mr. Rakestraw also agreed that Mr. Rakestraw would call the other employees in the IT department to determine whether any of them were incurring personal charges on their Cingular Visa Cards. (Exhibit 1, ¶ 13).

As of January 30, 2003, the following employees reported to Mr. Rakestraw: Lisa Detman (IT Project Manager - Caucasian); Erlene Adams (IT Analyst - African American); Leonard Damron (IT Specialist - African American); John Poythress (IT Associate Analyst - Caucasian); Rodney Milton (IT Specialist - African American); Tim Hurd (IT Senior Analyst - African American); Dan Quina (IT Specialist - Caucasian); and James Flynn (IT Senior Analyst - Caucasian). (Exhibit 1, ¶ 14).  Mr. Rakestraw called the employees on January 30, 2003. (Exhibit 1, ¶ 14; Exhibit 3, p. 87).

When Mr. Rakestraw called, he asked each of them words to the following effect:  "Have you been making personal charges on your Cingular Visa Card?"; and, "Have you been charging gas for your personal vehicle on your Cingular Visa Card?" (Exhibit 1, ¶ 14; Exhibit 3, p. 88 ("[Mr. Rakestraw] asked me how did I understand the policy in regard to gas/mileage and reimbursement in general.").  Ms. Detman (Caucasian), Mr. Hurd (African American), Mr. Quina (Caucasian) and Mr. Flynn (Caucasian) all answered with words to the effect, "No, I understand the policy."

(Exhibit 1, ¶ 14).  Mr. Rakestraw did not further investigate Ms. Detman, Mr. Hurd, Mr. Quina or Mr. Flynn because they had given him answers that led him to believe they knew that it was a violation of Cingular policy to incur personal charges on a Cingular Visa Card. (Exhibit 1, ¶ 14).

In contrast, Ms. Adams told him that she frequently charged gas on her Cingular Visa Card for her personal vehicle when she took business trips, even though she knew she would only be reimbursed for mileage and not gas. (Exhibit 1, ¶ 15; Exhibit 3, pp. 88-89).  Ms. Adams did not admit to incurring any other personal charges on her Cingular Visa Card. (Exhibit 1, ¶ 15).  Mr. Poythress (Caucasian) and Mr. Damron (African American) gave Mr. Rakestraw answers that were not clear or that led him to believe they may have been inappropriately incurring personal charges on their Cingular Visa Cards. (Exhibit 1, ¶ 15).

For these reasons,  Mr. Rakestraw decided to further investigate the charges that Ms. Adams, Mr. Poythress, and Mr. Damron had been incurring on their Cingular Visa Cards. (Exhibit 1, ¶ 15).  Mr. Rakestraw  requested a copy of the history of charges that Ms. Adams, Mr. Poythress, and Mr. Damron had incurred on their Cingular Visa Cards.  (Exhibit 1, ¶ 14, Appendix H (copy of the history of charges for Adams, Poythress, and Damron)).

**H.** **Mr. Rakestraw Terminated Mr. Milton's Employment on February 3, 2003**

Cingular's Ethics Department is responsible for ensuring that supervisors and managers throughout the company consistently enforce policies for employees who commit the same infractions. (Exhibit 2, ¶ 7). Ms. Horcharik spoke with Carolina King (Caucasian), who was a member of the Ethics Department in early 2003. (Exhibit 2, ¶ 7). The Ethics Department confirmed that other employees had been, or were about to be, terminated because Cingular had learned that they had incurred personal charges on their Cingular Visa Cards. (Exhibit 2, ¶ 7). The Ethics Department approved Mr. Milton's termination and, subsequently, Ms. Adams' termination. (Exhibit 2, ¶ 7).

Ms. Horcharik called Mr. Rakestraw on Friday, January 31, 2003, and confirmed that, in similar situations in other parts of the company, employees had been terminated for incurring personal charges on a Cingular Visa Card. (Exhibit 1, ¶ 16). Ms. Horcharik recommended that Mr. Milton be terminated. (Exhibit 1, ¶ 16). Mr. Rakestraw accepted Ms. Horcharik's recommendation and made the decision on January 31, 2003 to terminate Mr. Milton's employment. (Exhibit 1, ¶ 16).

On Monday, February 3, 2003, Mr. Rakestraw met with Mr. Milton at Cingular's Huntsville, Alabama location at approximately 8:30 a.m. (Exhibit 1, ¶ 17).

14

Mr. Rakestraw told Mr. Milton that his employment with Cingular was terminated because he had improperly used his Cingular Visa Card for personal expenses in violation of company policy. (Exhibit 1, ¶ 17).

Mr. Milton called Ms. Adams on February 3, 2003 and told her that his employment had been terminated "because of the charges on his credit card." (Exhibit 3, p. 92).[6] As a result of Mr. Milton's call, Ms. Adams became concerned that she too might be terminated because she used her Cingular Visa Card "[f]or personal expenses as well as business-related, gas expenses." (Exhibit 3, p. 94).

Mr. Rakestraw hired Clarence Windbush (IT Specialist - African American) in July 2003 and Jeff Parris (IT Specialist - Caucasian) in August 2003. (Exhibit 1, ¶ 30).  Both Mr. Windbush and Mr. Parris assumed some of Mr. Milton's job duties. (Exhibit 1, ¶ 30).

## I.   Mr. Rakestraw Investigated the Charges That Ms. Adams Incurred on Her Cingular Visa Card in 2002

On or about Monday, February 3, 2003, Mr. Rakestraw reviewed a history of charges Ms. Adams had incurred on her Cingular Visa Card in 2002.  (Exhibit 1, ¶ 18, Appendix H).   It appeared to Mr. Rakestraw that Ms. Adams had incurred personal charges on her Cingular Visa Card.  (Exhibit 1, ¶ 16).  For example, Ms.

---

[6]Mr. Milton filed a lawsuit against Cingular alleging that he was terminated because of his race. *See Rodney Milton v. Cingular Wireless Employee Services, Inc.*, Case No. CV-03-J-2892-NE. Cingular filed a Motion for Summary Judgment in that case that was granted on December 1, 2004.

Adams had incurred charges at Bruno's (a grocery store) and a Red Lobster restaurant in Maryland (which is the state where Ms. Adams' parents resided and where Ms. Adams did not conduct business for Cingular), and both of these charges were incurred on a Saturday. (Exhibit 1, ¶ 16).

After speaking with Ms. Horcharik again, Mr. Rakestraw was of the opinion that he would probably terminate Ms. Adams' employment; however, he wanted to talk with Ms. Adams again and giver her the opportunity to explain the charges before he made a final decision. (Exhibit 1, ¶ 16). Unfortunately, Ms. Adams' father passed away on Saturday, February 1, 2003 or Sunday, February 2, 2003. (Exhibit 1, ¶ 19). Ms. Adams began bereavement leave on Monday, February 3, 2003, and she began a disability leave immediately thereafter due to complications resulting from her pregnancy. (Exhibit 1, ¶ 19).

Ms. Adams' last day of work before taking bereavement and disability leave was Friday, January 31, 2003, and she did not return to work until more than seven (7) months later - on September 2, 2003. (Exhibit 1, ¶ 19). Sometime toward the end of the week of February 3, 2003, when Mr. Rakestraw learned that Ms. Adams would not be returning after her bereavement leave, Ms. Horcharik and Mr. Rakestraw decided that they would not confront Ms. Adams with the issue of her charges until she returned from her leave. (Exhibit 1, ¶ 19). Cingular's general policy is to await

an employee's return from leave to address disciplinary action resulting from conduct occurring before the leave. (Exhibit 1, ¶ 19).   As fully discussed below, Mr. Rakestraw did not talk with Ms. Adams about the charges on her Cingular Visa Card until she returned to work on September 2, 2003. (Exhibit 1, ¶ 19).

**J.**   **Mr. Poythress Was Terminated on February 12, 2003 Because He Incurred Charges for Personal Expenses on His Cingular Visa Card**

On or about February 3, 2003, Mr. Rakestraw reviewed a history of charges Mr. Poythress incurred on his Cingular Visa Card in 2002. (Exhibit 1, ¶ 20, Appendix H).  It appeared to Mr. Rakestraw that Mr. Poythress had incurred personal charges on his Cingular Visa Card. (Exhibit 1, ¶ 20).   For example, Mr. Poythress had incurred several charges for gas and food that Mr. Rakestraw did not believe were business expenses. (Exhibit 1, ¶ 20).  When Mr. Rakestraw called Mr. Poythress and confronted him about the charges, Mr. Poythress was unable to explain why each of the charges were business expenses. (Exhibit 1, ¶ 20).

Mr. Poythress sent Mr. Rakestraw an email on February 3, 2003 that attempted to explain why each of the charges he had incurred on his Cingular Visa Card in 2002 were business expenses. (Exhibit 1, ¶ 21, Exhibit I).   Mr. Rakestraw was not persuaded by the explanations provided by Mr. Poythress in the email. (Exhibit 1, ¶ 21).  Mr. Poythress was unable to establish that many of the charges he incurred on

17

his Cingular Visa Card were business expenses. (Exhibit 1, ¶ 22).   Despite Mr. Poythress' efforts and even though he never admitted to incurring personal charges on his Cingular Visa Card, Mr. Rakestraw reached the conclusion that Mr. Poythress had incurred personal charges on his Cingular Visa Card. (Exhibit 1, ¶ 22).

Mr. Rakestraw spoke with Ms. Horcharik again about the results of his communications with Mr. Poythress, and she recommended that Mr. Poythress be terminated. (Exhibit 1, ¶ 22).   Mr. Rakestraw terminated Mr. Poythress's employment on February 12, 2003, because he had improperly used his Cingular Visa Card for personal expenses in violation of company policy. (Exhibit 1, ¶ 22).  Mr. Poythress called Ms. Adams and told her that his employment had been terminated. (Exhibit 3, pp. 95-96).[7]

## K.   Mr. Damron Was Given a Written Warning Because He Incurred a Personal Expense on His Cingular Visa Card

When Mr. Rakestraw reviewed the history of the charges that Mr. Damron had incurred on his Cingular Visa Card in 2002, there was only one charge and it was for a work-related MicroSoft Examination. (Exhibit 1, ¶ 23).  Cingular's policy on reimbursement for such examinations is that the employee is required to pay for the

---

[7]After learning that Mr. Milton and Mr. Poythress had been terminated, Ms. Adams believed that she also would be terminated.  Ms. Adams interviewed for a job with the City of Huntsville in July 2003, which is when she was still out of work from Cingular on disability leave. (Exhibit 3, pp. 105-106).  Ms. Adams admits the only reason she interviewed for this job was because she believed her employment with Cingular would be terminated. (Exhibit 3, p. 106).

examination.(Exhibit 1, ¶ 23).   Thus, Mr. Damron should not have charged the examination on his Cingular Visa Card, as it was considered a personal charge. (Exhibit 1, ¶ 23).  If Mr. Damron had passed the examination, he would have been reimbursed by Cingular. (Exhibit 1, ¶ 23).  However, Mr. Damron did not pass the examination, so he was not reimbursed. (Exhibit 1, ¶ 23).

Mr. Rakestraw called Ms. Horcharik and told her what Mr. Damron had done. (Exhibit 1, ¶ 23).  Mr. Rakestraw and Ms. Horcharik agreed that termination was too severe a sanction for a single infraction (one charge) regarding a work-related examination. (Exhibit 1, ¶ 23).  Mr. Rakestraw gave Mr. Damron a written warning, instead of terminating his employment. (Exhibit 1, ¶ 23).

## L.   Mr. Rakestraw Learned on February 5, 2003 That Ms. Adams Had Called Cingular's Ethics Hotline

On February 5, 2003, Ms. Horcharik informed Mr. Rakestraw that one of his employees had called Cingular's Ethics Hotline on January 31, 2003, to complain that he/she was being treated differently by Mr. Rakestraw because of his/her race. (Exhibit 1, ¶ 24, Appendix J (copy of the hotline report)).[8]  Specifically, the caller said that Mr. Rakestraw had confronted him/her about being aggressive and controlling toward clients, and that a coworker name Lisa Detman was not required

---

[8]It is no coincidence that Ms. Adams called the hotline shortly *after* Mr. Rakestraw had called her and asked her about charges that she and Mr. Milton had incurred on their Cingular Visa Cards. (Exhibit 3, p. 119).  Ms. Adams knew she was about to be caught.

to do field work.  (Exhibit 1, ¶ 24, Appendix J).

Cingular's Ethics Hotline is operated by a third-party on behalf of Cingular, so no one from Cingular spoke with the caller. (Exhibit 1, ¶ 24).  The caller did not identify himself/herself. (Exhibit 1, ¶ 24).  Nonetheless, based on the allegations contained in Appendix J, Ms. Horcharik and Mr. Rakestraw believed the caller may have been Ms. Adams. (Exhibit 1, ¶ 24).

Ms. Horcharik investigated the allegations and concluded that Ms. Adams had not been discriminated against on the basis of her race. (Exhibit 2, ¶ 11).  The hotline report indicated that the caller (Ms. Adams presumably) would call back; however, she did not call back. (Exhibit 2, ¶ 11).

**M.**  **Mr. Rakestraw Learned on February 7, 2003 That Mr. Milton Had Called Cingular's Ethics Hotline**

On or about February 7, 2003, Mr. Rakestraw learned that Mr. Milton had called the Ethics Hotline shortly after his termination to complain about his termination. (Exhibit 1, ¶ 27, Appendix K  (copy of the hotline report)).  Mr. Milton complained during the hotline call that Ms. Detman had also incurred some personal charges on her Cingular Visa Card. (Exhibit 1, ¶ 27).  As a result of Mr. Milton's complaint, Mr. Rakestraw reviewed a history of the charges Ms. Detman incurred on her Cingular Visa Card in 2002, and he reviewed some of her expense reports.

(Exhibit 1, ¶ 27).

Mr. Rakestraw did not see any charges that he believed were suspicious and not business related. (Exhibit 1, ¶ 27).  For example, Mr. Rakestraw did not see any out-of-state charges that were unrelated to work she had performed, and Mr. Rakestraw did not see any charges on a Saturday. (Exhibit 1, ¶ 27).  Nonetheless, Mr. Rakestraw spoke with Ms. Detman again, and she again confirmed that she had not incurred any personal charges on her Cingular Visa Card. (Exhibit 1, ¶ 27).

## N.   Mr. Rakestraw Terminated Ms. Adams' Employment on September 2, 2003

Ms. Adams returned to work on September 2, 2003, and  Mr. Rakestraw met with her that morning at approximately 10:00 a.m. (Exhibit 1, ¶ 29).  Though no one told Ms. Adams that she would be meeting with Mr. Rakestraw that morning, she had already started packing her personal belongings and "clearing things out" because she assumed that she would be terminated. (Exhibit 3, pp. 109-110).  Mr. Rakestraw had a sheet of specific charges that she had incurred on her Cingular Visa Card; these were charges Mr. Rakestraw suspected were for personal expenses. (Exhibit 1, ¶ 29, Appendix M (copy of the list); Exhibit 3, p. 112).

Mr. Rakestraw asked Ms. Adams to explain the charges, but she said she would not be able to do so without going back to look at the paperwork. (Exhibit 1, ¶ 29;

21

Exhibit 3, pp. 111-112).  Ms. Adams said the charges "had been a while back." (Exhibit 1, ¶ 29; Exhibit 3, p. 112).  Ms. Adams did not admit that any of the charges were for personal expenses.  (Exhibit 1, ¶ 29).

Mr. Rakestraw left the meeting and reviewed Ms. Adams' expense reports (Exhibit 1, ¶ 29).  Mr. Rakestraw wanted to see if Ms. Adams had submitted any of the charges on her expense reports; if she had done so, that might have suggested that the charges were for business expenses. (Exhibit 1, ¶ 29).  However, Mr. Rakestraw discovered that Ms. Adams had not submitted most of the charges on her expense report. (Exhibit 1, ¶ 29).

Mr. Rakestraw spoke with Ms. Horcharik after reviewing the expense reports, and she recommended that he terminate Ms. Adams' employment. (Exhibit 1, ¶ 29).  Mr. Rakestraw returned and met with Ms. Adams shortly after lunch. (Exhibit 1, ¶ 29).  Mr. Rakestraw told Ms. Adams that her employment was terminated because she had violated the Code of Business Conduct by incurring personal charges on her Cingular Visa Card. (Exhibit 1, ¶ 29; Exhibit 3, p. 115).

## O.   Cingular Terminated Other Employees Who Incurred Charges for Personal Expenses on Their Cingular Visa Cards

The following additional Cingular employees were terminated between January 24, 2003 and February 18, 2003, after Cingular learned that they had incurred

personal expenses on their Cingular Visa Cards: (i) a Caucasian employee in Georgia terminated on February 18, 2003; (ii) an African American employee in Mississippi terminated on February 12, 2003; (iii) a Caucasian employee in North Carolina terminated on February 10, 2003; (iv) an African American employee in Maryland terminated on February 14, 2003; (v) a Caucasian employee in Florida terminated on February 5, 2003; and (vi) an Hispanic employee in Texas terminated on January 24, 2003. (Exhibit 2, ¶ 8).

**P.**   **BellSouth Mobility Did not Have a Policy That Prohibited Employees from Incurring Charges for Personal Expenses on Their Company Charge Cards**

Cingular's predecessor, BellSouth Mobility, did not have a policy that prohibited employees from incurring charges for personal expenses on their company charge cards. (Exhibit 2, ¶ 10).  In contrast, Cingular prohibits employees from incurring charges for personal expenses on their Cingular Visa Cards. (Exhibit 2, ¶ 10).  Cingular guarantees each employee's credit card; therefore, it implemented a different policy to avoid the risk of being obligated to pay personal expenses that an employee might incur on the credit card but fail to pay. (Exhibit 2, ¶ 10).

**Q.**   **John Poythress Had Not Been Previously Disciplined for Incurring Personal Expenses on His Corporate American Express Charge Card**

Ms. Adams alleges that Mr. Poythress had previously been disciplined at

BellSouth Mobility for incurring personal charges on his corporate American Express charge card. (Complaint, ¶ 7; Exhibit 3, pp. 162-163).[9] Ms. Adams suggests that she too should have been disciplined for her first infraction, instead of being terminated. (Complaint, ¶ 7). However, Mr. Poythress had not been disciplined at BellSouth Mobility for incurring personal charges on his corporate American Express charge card. (Exhibit 7, ¶ 5).

### III.  DISCUSSION

### A.  <u>Race Discrimination Claim</u>

Three forms of proof may be used to establish an employer's intention to discriminate:  (1) statistical evidence of a pattern of discrimination;[10] (2) direct evidence of a discriminatory animus;[11] or (3) circumstantial evidence.  The evaluation of the sufficiency of a plaintiff's proof of the employer's intent differs, depending upon which form is used.  Regardless of the form employed, however, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

---

[9] Before filing the Complaint, Ms. Adams filed two charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  (Exhibits 4 and 5).  The EEOC concluded there was no evidence that Cingular violated Title VII. (Exhibit 10).

[10] *See, e.g., Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1027 (11th Cir. 1994).

[11] *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).  Only the most blatant remarks indicating a discriminatory animus constitute direct evidence.  *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  Further, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal a blatant discriminatory animus."  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community of Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Plaintiff has presented only circumstantial evidence on this issue; accordingly, the court will analyze her claim under the *McDonnell Douglas* burden-shifting framework. *See*, *e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).

To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that

25

the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

In the Eleventh Circuit, "a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if [she] shows that [she] is a member of a

26

protected class, that [she] was qualified for the job from which [she] was fired, and 'that the misconduct for which [she] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (quoting *Davin v. Delta Airlines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)[12]). "When an individual proves that [she] was fired but one outside [her] class was retained although both violated the same work rule, this [gives rise to a presumption] that the rule was discriminatorily applied against that individual, regardless of the race or sex of the replacement." *Nix*, 738 F.2d at 1186; *see also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282-84, 96 S. Ct. 2574, 2579-80, 49 L. Ed. 2d 493 (1976) (holding that an employer would violate Title VII if it fired black employees who participated in a theft of cargo while retaining white employees guilty of the same offense).

In addition, a plaintiff who contends that similarly situated employees were disciplined more leniently "must show that the comparator employees [were] 'involved in or accused of the same or similar conduct' yet [were] disciplined in a different, more favorable manner." *Anderson v. WBMG–42*, 253 F.3d 561, 564 (11th

---

[12]In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981.

Cir. 2001) (citation omitted); *see also Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1334-35 (11th Cir. 2000) ("[T]he law does not require that a 'similar situated' individual be one who has 'engaged in the same or nearly identical conduct' as the disciplined plaintiff.  Instead, the law only requires 'similar' misconduct from the similarly situated comparator.") (citation omitted).

Plaintiff failed to submit evidence supporting a *prima facie* case.  Plaintiff can point to no comparator outside her protected class who was treated differently for engaging in similar conduct.  For that reason alone, her race discrimination claim cannot proceed, and defendant is entitled to judgment as a matter of law.  Although plaintiff baldly points to Mr. Poythress as a Caucasian comparator who received favorable treatment, the uncontroverted evidence is that Mr. Poythress was terminated, just like plaintiff, for improper use of his company credit card.  Plaintiff's irrelevant and unsupported references to how Mr. Poythress was treated by defendant's predecessor, BellSouth Mobility, are unavailing.  Summary judgment is due to be granted on plaintiff's race discrimination claim.

## B.   Retaliation Claim

"Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in

activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).

The "opposition clause" provides protection to those employees "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989); *see also, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (same).

29

Generally speaking, a plaintiff must prove four elements to establish a *prima facie* case of retaliation: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal linkage between the protected conduct and the adverse employment action. *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997)).

Defendant moves for summary judgment arguing that there is no evidence of a causal link between plaintiff's complaint of race discrimination and her ultimate termination. Plaintiff called defendant's Ethics Hotline and complained of race discrimination on January 31, 2003. (Exhibit 3 at 158, 164). It was not until February 5, 2003, that Mr. Rakestraw learned plaintiff had called the Ethics Hotline to complain of race discrimination.

By that time, Mr. Rakestraw's investigation was well underway. Mr. Rakestraw had already spoken to Mr. Milton regarding improper charges on his company credit card and begun an investigation of other employees by January 30, 2003. Mr. Rakestraw terminated Mr. Milton on February 3, 2003, and after speaking with Ms. Horcharik again, Mr. Rakestraw was of the opinion that he would probably terminate Ms. Adams' employment. However, he wanted to talk with Ms. Adams again and giver her the opportunity to explain the charges before her made a final

decision. (Exhibit 1, ¶ 16). Ms. Adams' father passed away on Saturday, February 1, 2003 or Sunday, February 2, 2003. (Exhibit 1, ¶ 19). Ms. Adams began bereavement leave on Monday, February 3, 2003, and she began a disability leave immediately thereafter due to complications resulting from her pregnancy. (Exhibit 1, ¶ 19).

Ms. Adams' last day of work was Friday, January 31, 2003, and she did not return to work until more than seven (7) months later - on September 2, 2003. (Exhibit 1, ¶ 19). Sometime toward the end of the week of February 3, 2003 when Mr. Rakestraw learned that Ms. Adams would not be returning after her bereavement leave, Ms. Horcharik and Mr. Rakestraw decided that they would not confront Ms. Adams with the issue of her charges until she returned from her leave. (Exhibit 1, ¶ 19). Cingular's general policy is to await an employee's return from leave to address disciplinary action resulting from conduct occurring before the leave. (Exhibit 1, ¶ 19). As previously discussed, Mr. Rakestraw did not talk with Ms. Adams about the charges on her Cingular Visa Card until she returned to work on September 2, 2003. (Exhibit 1, ¶ 19).

It appears from the uncontroverted evidence that Mr. Rakestraw had made the decision that he would have to terminate plaintiff before he ever learned she had made a complaint of race discrimination on the Ethics Hotline. Further, the period

in excess of seven (7) months between plaintiff's complaint of race discrimination and her termination is insufficient as a matter of law to establish a causal connection. *See Maniccia*, 171 F.3d at 1370; *cf. Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (finding plaintiff's discharge one month after filing complaint with EEOC satisfies causation element).  Failing to establish a causal connection between plaintiff's internal complaint and her ultimate termination, summary judgment is due to be granted on the retaliation claim.[13]

## IV.  CONCLUSION

In light of the foregoing, the motion for summary judgment is due to be granted.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 13th day of January, 2005.

_____
United States District Judge

---

[13]Curiously, plaintiff does not base her retaliation claim on the filing of her charge of discrimination with the EEOC and the participation clause of Title VII.  *See* doc. no. 1 (complaint) and doc. no 24 (plaintiff's opposition to summary judgment). It appears that plaintiff filed one charge of discrimination, and defendant was notified of that charge, prior to plaintiff's termination. *See* doc. no. 16 (defendant's motion to compel, attachments to Tab 2).  Because plaintiff never alleged this filing as a factual basis for her retaliation claim in her complaint, and because plaintiff never asserted this argument throughout the course of these proceedings, particularly in response to defendant's motion for summary judgment, the court cannot look at this evidence to support a claim for retaliation.